[Civ. No. 1943. Fourth Appellate District.—November 25, 1935.]

FRANCES E. WARNER et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

Russell V. Grant for Petitioners.

Everett A. Corten for Respondents.

BARNARD, P. J.—This is a proceeding to annul an award of the respondent commission denying compensation on account of the death of Stephen Warner, the husband and

father, respectively, of the petitioners. Stephen Warner was a deputy sheriff in the employ of the respondent county. On January 8, 1935, he served as a bailiff in one of the superior courts in that county until 5 o'clock in the afternoon. Thereafter he was detailed for duty as an inspector at the international border line between the United States and Mexico. He worked there from 6 o'clock P. M. on that day until 2 A. M. the following morning and continued to work there during those hours of each day until January 13, 1935, his duty being to inspect automobiles crossing the border line. On January 13, 1935, a respiratory infection became manifest and he was compelled to quit work early in the evening and return to his home. He was taken to the United States Naval Hospital at San Diego the same night and died from pneumonia on January 20, 1935.

█ The commission found that the death of Warner was not caused by an injury arising out of or in the course of his employment. It is well established that to permit a recovery in cases of this nature the employee must have been subjected by his employment to a special exposure which was beyond that to which the commonalty is subjected. █ The essential question here is whether the implied finding that the employment in question subjected the deceased to no special exposure is sustained by the evidence.

It appears from the transcript that the only shelter provided for such inspectors was a platform adjoining a building, with an overhanging roof. In performing his duties the deceased had to leave this platform and go into the street and inspect each car as it crossed the border. Mrs. Warner testified that her husband was in good health up to the time he began this work, and that about two days after he began the work he complained that he got his feet wet there, that it had been wet all of the time, that there was no shelter, and they had to be out of doors all of the time. She also testified that he caught a cold but continued to work every night, and that on the 13th he came home about 9 o'clock in the evening complaining of a pain in his chest and saying that he was very cold and damp as it had rained there for several days. Earlier in the week her husband had told her that he was exposed all of the time and that he had to stay out in the wind and the cold and the mud. Another inspector testified that he saw the deceased during the week in question; that

it was cold and damp at the border during that entire week; that it was raining intermittently and that there was a depression in the pavement and the pavement was constantly covered with water; that that was a cold spot to work in and there was a cold wind from the east during the evening; that the shelter was a protection when the rain fell straight down but the wind usually comes from the sea and that "You can get good and cold and wet both"; and that when a car came along it was necessary to step out into the open through some loose dirt which got wet when it rained. A medical report from the naval hospital was introduced in which it was stated that the deceased had been exposed to rain for three days prior to January 10th and that death was due to pneumonia.

The respondents rely entirely upon a weather report from San Diego, which is approximately seventeen miles from the border, and upon a report from a physician in San Francisco based upon his examination of certain records, including this weather report. The weather report showed a low temperature ranging from 49 degrees to 54 degrees during this week with an extreme wind velocity ranging from nine to twenty miles an hour. It also gave an average temperature ranging from 54 degrees to 60 degrees and an average wind velocity ranging from 4.4 miles per hour to 8.5 miles per hour. While it showed that it was cloudy on each day during this week there was rain only on the 9th and 11th, the rain on the 9th being between 6 o'clock P. M. and 9 o'clock P. M. and on the 11th between 4 o'clock A. M. and 6 o'clock P. M. This weather report was introduced in evidence with the understanding that it was not necessarily conclusive as to the weather conditions at the point at which the deceased was employed. The respondents argue that the rain on January 11th, as shown by this report, could not have affected the deceased since it fell between 4 o'clock A. M. and 6 o'clock P. M. and while the deceased was not at work. The report shows that .56 of an inch fell that day at San Diego and if the same amount fell at the border at the same time it may have materially contributed to a wet condition of the ground and pavement during the succeeding hours when the deceased was there employed. The report of the physician referred to, after setting forth that three individuals stated it was quite rainy at the border during that week, sets forth that the

temperatures and wind velocity were practically the same at the border as at San Diego during that week and states there is nothing to indicate that the deceased man's clothing became wet while on duty, and that the widow expressly stated that her husband did not become wet though his feet became damp when it rained. While the report admits that long-continued chilling of the body and exposure may lower the resistance and make the body more susceptible to infection, it goes on to state that no such condition existed here. The report is rather unusual in that instead of being an expression of expert opinion on facts for the guidance of the commission it reviews all of the evidence and undertakes to decide the question before the commission, namely, whether or not there was a special exposure in the employment in question. In so doing, the report misquotes a part of the evidence and the conclusion therein is almost entirely based upon the weather report referred to and the assumption that the weather was identical at the two points during that week.

There is nothing in the record to show that the weather conditions at the two points were identical and the only evidence before us is to the contrary. The testimony as to the actual weather conditions at the border is not contradicted. The evidence introduced by the petitioners made out at least a *prima facie* showing of a special exposure to which the deceased was subjected by his employment. This was not overcome by anything in the weather report or in the report of the San Francisco physician, relied upon by the respondents. The record fails to sustain the implied finding of the commission to the effect that there was no special exposure in this employment.

The award is annulled and the cause remanded for further proceedings.

Marks, J., and Jennings, J., concurred.